# IN THE SUPREME COURT OF IOWA

No. 57 / 06-0431

Filed June 15, 2007

**STATE OF IOWA**,

    Appellant,

vs.

**TERRY LYNN McGRANE**,

    Appellee.

_____

    Appeal from the Iowa District Court for Cerro Gordo County, John S. Mackey, Judge.

    State seeks discretionary review of district court decision suppressing drug evidence discovered in defendant's home and his statements admitting ownership of the contraband.  **AFFIRMED.**

    Thomas J. Miller, Attorney General, Mary E. Tabor, Assistant Attorney General, and Paul L. Martin, County Attorney, for appellant.

    Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant State Appellate Defender, for appellee.

**STREIT, Justice.**

Deputy sheriffs arrested Terry McGrane in his home. They had a valid arrest warrant for violating probation. After McGrane was arrested, handcuffed, and seated at the kitchen table, two deputies went to the upstairs area of the home and discovered drugs, cash, and drug paraphernalia. After this initial search, McGrane was taken to jail and the deputies obtained a search warrant. McGrane moved to suppress all of the evidence seized as well as his incriminating statements concerning the evidence. We find the deputies' initial search violated McGrane's constitutional right to be free from unreasonable searches. The initial search was neither a search incident to arrest nor a valid protective sweep. Moreover, the evidence was not in "plain view." The State failed to prove the evidence was obtained through an independent source. Consequently, the district court properly excluded all of the evidence and incriminating statements under the exclusionary rule. We affirm the district court.

## I.     Facts and Prior Proceedings

On July 14, 2005, Cerro Gordo County Deputy Sheriff Matt Klunder was surveilling a house in Mason City looking for McGrane. McGrane was wanted on an outstanding arrest warrant for violating the terms of his probation. Shortly after 3:00 p.m., Deputy Klunder saw Alberto Ramon, the brother of McGrane's girlfriend, Rosemary Ramon, leave the residence and drive off in a Chevy Blazer. Deputy Klunder knew Alberto's driver's license was suspended so he stopped him. Alberto told Deputy Klunder McGrane was in the house.

Being otherwise occupied with the traffic stop, Deputy Klunder called Chief Deputy David Hepperly to let him know McGrane's whereabouts. Deputy Hepperly and Deputy Nathan Ewalt arrived at the house at approximately 3:20 p.m. Deputy Ewalt knocked on the residence's side

door, which leads directly into the kitchen. Rosemary's daughter, Melissa Schutz, who was in her early 20s, answered the door. Schutz initially denied McGrane was there. When the deputies told her they had information he was there, Schutz's demeanor changed and she allowed the deputies to enter the home. The three proceeded into the kitchen area. Around the corner of the kitchen, there was a stairwell leading to the second floor of the one-and-a-half story house. Schutz yelled up the stairs for McGrane. Deputy Hepperly heard someone moving around upstairs and started up the staircase. When Deputy Hepperly was about a third of the way up the stairs, McGrane appeared from behind a bed sheet curtain which was used to cordon off a small storage area to the right of the top of the steps. Deputy Hepperly saw McGrane put something behind the curtain as he emerged from behind it. Deputy Hepperly informed McGrane of the arrest warrant and ordered him downstairs. McGrane walked down the stairs and into the kitchen.[1] McGrane was told he was being arrested pursuant to the warrant. Deputy Ewalt searched him, placed him in handcuffs and sat him down on a kitchen chair. According to Deputy Ewalt, McGrane was cooperative at all times.

Deputy Hepperly contacted Deputy Klunder and told him McGrane was in custody. Shortly thereafter, Deputy Klunder arrived at the house and Deputy Hepperly told him McGrane tried to hide something behind the curtain upstairs. Deputy Klunder and Deputy Hepperly then went upstairs, leaving McGrane in Deputy Ewalt's custody.

The record does not clearly explain the layout of the second level of the residence. It appears the stairway led to an open area and did not include separate rooms or closets. The living area included a bed,

---

[1]It is unclear from the record whether Deputy Ewalt exerted physical control over McGrane on the stairway or at the bottom of the stairs.

couch/futon, coffee table, and computer stand. While upstairs, Deputy Klunder observed drugs and paraphernalia strewn on the coffee table. The deputy also saw a scale, some baggies on the bed, and "a pillow type item with a zipper on it that had a baggie sticking out of it." Deputy Klunder removed the baggie and found marijuana and cash. Deputy Klunder also saw marijuana in a tray on the computer stand. Meanwhile, from behind the bed sheet curtain, Deputy Hepperly retrieved a small leather pouch, which contained $60 in cash and thirteen small baggies of what appeared to be methamphetamine. Among the general disarray of the upstairs living area, the deputies also found several items of property in unopened packages.

Returning downstairs, Deputy Klunder asked McGrane about the items upstairs, and McGrane admitted "there was drug paraphernalia in the upstairs." Sometime following this exchange, Deputy Ewalt took McGrane to the county jail for processing.

Deputies Klunder and Hepperly contacted Investigator Logan Wernet of the Mason City Police Department for assistance in applying for a search warrant. Based on the information Investigator Wernet received from them regarding their initial search of the second floor, the surveillance conducted by Deputy Hepperly the day before, and McGrane's criminal history (which included convictions for possession and delivery of drugs), Investigator Wernet applied for and obtained a warrant to search the house for drugs, weapons, and drug-related evidence. The deputies seized multiple baggies of methamphetamine and marijuana, as well as scales, a scanner and various items of drug paraphernalia.

At about 10:30 that night, Deputies Hepperly and Klunder interviewed McGrane at the jail. Deputy Klunder read McGrane the *Miranda* warning at the beginning of the interview. McGrane did not

request counsel at any time during the interview. He made several incriminating statements concerning the evidence seized from his home.

McGrane was charged with three counts: (1) possession of more than five grams of methamphetamine with intent to deliver in violation of Iowa Code section 124.401(1) (2005), a class "B" felony, (2) a tax stamp violation under Iowa Code section 453B.12, a class "D" felony, and (3) possession of marijuana as a third or subsequent offense in violation of Iowa Code section 124.401(5), a class "D" felony. McGrane pled not guilty. He alleged the deputies' initial search of his home following his arrest violated his constitutional rights under the Fourth Amendment of the United States Constitution and Article 1, section 8 of the Iowa Constitution. McGrane moved to suppress all evidence seized as well as any statements made by him after his arrest. The State resisted, citing several exceptions to the search warrant requirement.

The parties presented evidence at a suppression hearing. The district court granted McGrane's motion to suppress, in its entirety. We granted the State's application for discretionary review.

## II.     Standard of Review

We review constitutional claims de novo. *State v. Heminover*, 619 N.W.2d 353, 356 (Iowa 2000), *overruled in part on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). This court independently evaluates the defendant's claim under the totality of the circumstances. *State v. Kinkead*, 570 N.W.2d 97, 99 (Iowa 1997) (quoting *State v. Cook*, 530 N.W.2d 728, 731 (Iowa 1995)). The court gives deference to the district court's factual findings due to its opportunity to assess the credibility of witnesses, but the court is not bound by those findings. *Turner*, 630 N.W.2d at 606.

### III.   Merits

McGrane alleges his constitutional right to be free from unreasonable searches and seizures was violated when the deputies searched the second floor of his home after he was arrested because the deputies did not have a search warrant at the time.  *See* U.S. Const. amend. IV; Iowa Const. art. 1, § 8.   A search conducted without a valid search warrant is per se unreasonable unless one of the well-known exceptions to the warrant requirement applies.  *State v. Kubit*, 627 N.W.2d 914, 918 (Iowa 2001) (citations omitted).  The State argues the following exceptions apply to the present case: (1) search incident to a lawful arrest; (2) protective sweep; and (3) search of items in plain view.  *See State v. Naujoks*, 637 N.W.2d 101, 107 (Iowa 2001) (citing *State v. Cline*, 617 N.W.2d 277, 282 (Iowa 2000)) (recognizing these exceptions).  The State has the burden of proving by a preponderance of the evidence that a warrantless search falls within one of the exceptions.  *Id.* at 107–08 (citing *State v. Gillespie*, 619 N.W.2d 345, 350 (Iowa 2000)).

### A.   Exceptions to the Warrant Requirement

McGrane does not deny the deputies had a right to arrest him in his home.  The deputies had a warrant for his arrest based on an alleged violation of his probation.  The Supreme Court has held "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  *Payton v. New York*, 445 U.S. 573, 603, 100 S. Ct. 1371, 1388, 63 L. Ed. 2d 639, 661 (1980); *accord State v. Luloff*, 325 N.W.2d 103, 105 (Iowa 1982).  Moreover, Schutz consented to the deputies entering the home.

Nevertheless, McGrane argues the deputies' search of the upstairs portion of his home *after* he was arrested was unreasonable and therefore

unconstitutional. We now consider the State's proffered justifications for the warrantless search.

### 1. Search Incident to Arrest

The State argues the deputies' search of the upstairs portion of McGrane's home was a valid search incident to arrest. The Supreme Court has "recognized there is ample justification for the search of an arrestee's person and the area within his or her immediate control." *State v. Canas*, 597 N.W.2d 488, 492 (Iowa 1999) (citing *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 2040, 23 L. Ed. 2d 685, 694 (1969)), *overruled in part on other grounds by Turner*, 630 N.W.2d at 606 n.2. The area to be searched is limited to the arrestee's "grab" area. *Chimel*, 395 U.S. at 763, 89 S. Ct. at 2040, 23 L. Ed. 2d at 694. "The purpose of such a search is to prevent the arrestee from destroying evidence or gaining possession of a weapon which could be used to resist arrest or effect an escape." *Canas*, 597 N.W.2d at 492 (citing *Chimel*, 395 U.S. at 763, 89 S. Ct. at 2040, 23 L. Ed. 2d at 694). Thus, in order to be constitutional, "[a] search incident to an arrest must be substantially contemporaneous with the arrest and confined to the immediate vicinity of the arrest." *Id.* (citing *Vale v. Louisiana*, 399 U.S. 30, 33, 90 S. Ct. 1969, 1971, 26 L. Ed. 2d 409, 413 (1970)). The search-incident-to-arrest exception does not provide authority "for routinely searching any room other than that in which an arrest occurs." *Chimel*, 395 U.S. at 763, 89 S. Ct. at 2040, 23 L. Ed. 2d at 694.

Both parties contend we must first decide where in the home McGrane was arrested in order to determine whether the deputies' warrantless search was a valid search incident to arrest.[2] The State claims

---

[2]For Fourth Amendment purposes, an arrest occurs when two conditions are satisfied: (1) the officers assert their authority to arrest and the purpose of the arrest; and (2) either the defendant submits to their control or the officers apply physical force in order to subdue him. *California v. Hodari D.*, 499 U.S. 621, 626–27, 111 S. Ct. 1547, 1551, 113 L. Ed. 2d 690, 697 (1991) (quoting Rollin M. Perkins, *The Law of Arrest*, 20 Iowa L. Rev.

McGrane was arrested at the top of the stairs when he complied with Deputy Hepperly's order to come downstairs. According to the State, the search-incident-to-arrest exception allowed the deputies to search the upstairs area after McGrane was handcuffed downstairs. McGrane, on the other hand, contends he was not arrested until he was downstairs in the kitchen and one of the deputies handcuffed him. Under the latter theory, the upstairs portion of McGrane's home would certainly not be "the immediate vicinity of the arrest." *Canas*, 597 N.W.2d at 492; *see People v. Robbins*, 369 N.E.2d 577, 580 (Ill. App. Ct. 1977) (holding officers greatly exceeded the permissible scope of a search incident to arrest when they went upstairs and searched the defendant's room after he was restrained at the bottom of the stairs).

However, we need not determine where the arrest occurred. Even if we found the arrest took place at the top of the stairs, the deputies were still not permitted to search the upstairs area because McGrane immediately left that area and remained handcuffed downstairs in the kitchen under armed guard while the search was conducted. *Compare Canas*, 597 N.W.2d at 493 (holding officers' search of defendant's motel room after he was arrested and handcuffed upon opening the door was not a valid search incident to arrest because he was not in the motel room at the time of the search), *with State v. Shane*, 255 N.W.2d 324, 327–28 (Iowa 1977) (holding officers' search of the defendant's motel room after he was arrested and handcuffed was a valid search incident to arrest because the search was confined to the small motel room where the arrest occurred, it took place within a minute or two after the arrest, and the defendant was still in the room). The justification

_____

201, 206 (1940)); *State v. Rains*, 574 N.W.2d 904, 910 (Iowa 1998). Similarly, Iowa Code section 804.5 defines an arrest as "the taking of a person into custody when and in the manner authorized by law, including restraint of the person or the person's submission to custody."

of a search incident to arrest is to prevent the arrestee from destroying evidence or gaining possession of a weapon. McGrane had no realistic ability to get back upstairs considering his location and the fact he was restrained.

The search-incident-to-arrest exception to the warrant requirement must be narrowly construed and limited to accommodating only those interests it was created to serve. *United States v. Graham*, 638 F.2d 1111, 1114 (7th Cir. 1981) (citing *Arkansas v. Sanders*, 442 U.S. 753, 759–60, 99 S. Ct. 2586, 2591, 61 L. Ed. 2d 235, 242 (1979)). We acknowledge some courts do not require the search area to be accessible to the defendant at the time of the search. *See, e.g., Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001). However, this court has expressly rejected such a holding in nonvehicle situations. *Canas*, 597 N.W.2d at 493 n.2. In *State v. Edgington*, 487 N.W.2d 675 (Iowa 1992), we upheld the search of the contents of a passenger compartment of a vehicle as part of a search incident to arrest even though the defendant had been removed from the vehicle and secured elsewhere. *Edgington*, 487 N.W.2d at 678. In *Canas*, we confined our holding in *Edgington* to "situations in which one's arrest involves some type of occupancy in a vehicle." *Canas*, 597 N.W.2d at 493 n.2. This makes sense because "we take any government intrusion into a citizen's *dwelling* very seriously." *Kubit*, 627 N.W.2d at 918 (emphasis added). Thus, we agree with the district court the deputies' initial search of the upstairs area was not a valid search incident to arrest.

### 2. Protective Sweep

The State also claims the deputies' search of the upstairs area was justified as a "protective sweep or cursory safety check." The combination of probable cause and exigent circumstances is a recognized exception to the warrant requirement. We have previously found danger of violence and

injury to officers to be an exigent circumstance, which may excuse the requirement of a search warrant. *State v. Holland*, 389 N.W.2d 375, 381 (Iowa 1986). "The officers must have specific, articulable grounds to justify a finding of exigency." *Naujoks*, 637 N.W.2d at 109. The reasonableness of the officers' search is based on an objective—as opposed to subjective—standard. *Id.* (citing *Cline*, 617 N.W.2d at 280–82). The Supreme Court has emphasized a protective sweep is not a full search of the premises:

> [It] may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Maryland v. Buie*, 494 U.S. 325, 335–36, 110 S. Ct. 1093, 1099, 108 L. Ed. 2d 276, 287 (1990).

The State interprets *Buie* as recognizing two types of protective sweeps: a limited sweep of the arresting area without justification versus a more expansive search of the premises with justification. In *Buie*, the Supreme Court said:

> We . . . hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Buie*, 494 U.S. at 334, 110 S. Ct. at 1098, 108 L. Ed. 2d at 286. The State argues the deputies' initial search satisfied either *Buie* "prong."

The first part of the statement in *Buie* simply acknowledges the search-incident-to-arrest exception. Officers are permitted to search the arrestee's immediate grab area for weapons and evidence without any

reasonable suspicion. This search would necessarily include spaces where a person could be hidden. If a particular search does not satisfy the search-incident-to-arrest exception because the officers previously abandoned the arrest site, then the first prong of the *Buie* statement will not validate the search because it is limited to protecting officers from an *immediate* attack. We have already held the deputies' search in the present case was not a valid search incident to arrest. Thus, for it to be a valid protective sweep, the State was required to produce "articulable facts which . . . would warrant a reasonably prudent officer in believing that the area . . . swept harbor[ed] an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S. Ct. at 1098, 108 L. Ed. 2d at 286.

The State offers several facts it contends would justify a reasonably prudent officer to believe individuals were present who posed a danger to them: McGrane appeared to be dealing drugs out of his home; Schutz initially lied to the deputies when asked if McGrane was home; and several people were in the home while the deputies were on the premises. We find none of these facts justify a protective sweep of the upstairs area of the home.

The State offered no evidence McGrane was believed to have guns or weapons in his home. *Compare Naujoks*, 637 N.W.2d at 109 (holding officers' warrantless search of defendant's apartment was not a valid protective sweep in part because there was no evidence that guns or any other weapons were involved in the burglary), *with Holland*, 389 N.W.2d at 380–81 (holding officers' warrantless search was a valid protective sweep because the arresting officers knew a gun had been stolen in the burglary and the defendant's accomplice was still at large). Moreover, the State offered no evidence to suggest dangerous people may be hiding on the premises. *See United States v. Kimmons*, 965 F.2d 1001, 1009 (11th Cir.

1992) (holding agents had articulable facts to justify protective sweep of defendant's home immediately following his arrest for conspiracy to rob an armored car: the FBI had just apprehended two of the defendant's armed accomplices and had knowledge of fourth conspirator whose identity and whereabouts were unknown); *United States v. Gilbert*, 774 F.2d 962, 964 (9th Cir. 1985) (holding officers were permitted to conduct a protective sweep of defendant's home because they had information defendant might be in the company of another fugitive who was reported to be armed, a car not belonging to defendant was in front of her home and officers surveilling the home suspected movement inside). Although it may be common for drug dealers to possess weapons, suspicion of drug dealing alone is not enough to justify a protective sweep. *United States v. Hauk*, 412 F.3d 1179, 1187 (10th Cir. 2005) (rejecting police practice of automatic protective sweeps of "drug houses" on assumption they are inherently dangerous); *see Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S. Ct. 1416, 1421, 137 L. Ed. 2d 615, 624 (1997) (rejecting "felony drug investigation" exception to knock-and-announce rule). The State is still required to allege specific facts and circumstances upon which reasonable inferences could be drawn to support a reasonable police officer's belief that weapons were on the premises and that someone else could have had access to those weapons and inflicted harm.

There is also no evidence to suggest the people the deputies encountered at the home were dangerous. Schutz came to the door when the deputies knocked. Although she initially lied about McGrane's presence, she eventually cooperated. Apparently, the deputies did not perceive her as a threat because they allowed her to remain in the kitchen unrestrained. At some point, a man came up from the basement and was allowed to leave. The deputies did not then do a protective sweep of the

basement. McGrane's girlfriend, Rosemary, and her sister came to the house while the deputies were there. Apparently, their presence did not pose a danger to the deputies because they were allowed to enter the home and stay in the kitchen while the deputies conducted their search.

In short, there was simply no evidence to find a reasonably prudent officer would believe the upstairs area harbored one or more dangerous individuals in order to justify the initial search. "This situation did not involve any objective indication of fear of violence or jeopardy more than any other police encounter with persons suspected of criminal activity would involve." *Naujoks*, 637 N.W.2d at 109. Deputy Ewalt even conceded at the hearing "the threat level wasn't raised for [him]." He testified he saw no need to secure the home.

Even if the deputies had reasonable suspicion that individuals were present who posed a danger to them, their search of the upstairs portion of McGrane's home exceeded "those spaces where a person may be found." [3] Moreover, the deputies had no legitimate purpose for remaining on the premises after McGrane was arrested. A protective sweep cannot last "longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335–36, 110 S. Ct. at 1099, 108 L. Ed. 2d at 287. We agree with the district court that the deputies' search was not a valid protective sweep.

*3.    Plain View*

Finally, the State argues a search warrant was not necessary for the deputies' initial search because the evidence seized was in plain view. "For the plain view exception to apply, police must be rightfully in the place that allows them to make the observation." *Kubit*, 627 N.W.2d at 918 (citations omitted). In addition, the State has the burden of proving (1) the item

---

[3] They unzipped one small leather pouch and pulled a baggie out of a pillow.

seized was in plain view and (2) its "incriminating character" was
" 'immediately apparent.' " *Horton v. California*, 496 U.S. 128, 136, 110 S.
Ct. 2301, 2308, 110 L. Ed. 2d 112, 123 (1990) (quoting *Coolidge v. New
Hampshire*, 403 U.S. 443, 466, 91 S. Ct. 2022, 2038, 29 L. Ed. 2d 564, 583
(1971)).

As we have already made clear, the deputies were not "rightfully" in
the upstairs portion of the home after McGrane was arrested, handcuffed,
and placed in the kitchen downstairs. Moreover, the deputies did more
than simply observe evidence out in the open. Thus, the district court
correctly held the plain view exception was not applicable.

**B.    Exclusionary Rule**

We find the initial search by the deputies in this case to be violative of
McGrane's constitutional rights because the deputies did not have a search
warrant at the time and none of the above-mentioned exceptions to the
warrant requirement was applicable. The exclusionary rule requires the
suppression of evidence discovered as a result of illegal government activity.
*Naujoks*, 637 N.W.2d at 111 (citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81
S. Ct. 1684, 1691, 6 L. Ed. 2d 1081, 1090 (1961)). "[T]he exclusionary rule
also prohibits the introduction of derivative evidence, both tangible and
testimonial, that is the product of the primary evidence, or that is otherwise
acquired as an indirect result of the unlawful search, up to the point at
which the connection with the unlawful search becomes 'so attenuated as to
dissipate the taint.' " *Murray v. United States*, 487 U.S. 533, 536–37, 108
S. Ct. 2529, 2533, 101 L. Ed. 2d 472, 480 (1988) (quoting *Nardone v. United
States*, 308 U.S. 338, 341, 60 S. Ct. 266, 268, 84 L. Ed. 307, 312 (1939)).
Justice Frankfurter coined the phrase, "fruit of the poisonous tree," to
illustrate the concept of tainted evidence. *Naujoks*, 637 N.W.2d at 111
(quoting *Nardone,* 308 U.S. at 341, 60 S. Ct. at 268, 84 L. Ed. at 312). The

purpose of excluding such evidence is twofold: to deter lawless police conduct and to protect the integrity of the judicial system. *Id.* (citations omitted).

However, there are exceptions to the exclusionary rule. In other words, there are circumstances where the evidence is admissible notwithstanding the illegal government conduct. The State argues the independent source and inevitable discovery doctrines are applicable in this case. Under the independent source doctrine, "it is possible to remove the taint of a prior illegality by obtaining the same information or evidence through means independent of the illegal conduct." *State v. Seager*, 571 N.W.2d 204, 211 (1997). The inevitable discovery doctrine is "an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray*, 487 U.S. at 539, 108 S. Ct. at 2534, 101 L. Ed. 2d at 481–82. The justification for these exceptions is as follows:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Nix v. Williams*, 467 U.S. 431, 443-44, 104 S. Ct. 2501, 2509, 81 L. Ed. 2d 377, 387 (1984) (citations omitted).

Because the State presented no evidence the drugs found in McGrane's home inevitably would have been discovered by lawful means, we find the inevitable discovery doctrine inapplicable. We now consider the independent source rule.

The State argues the evidence is admissible because it was also discovered via a valid search warrant. McGrane argues the search warrant was not an independent source because the affidavit supporting the warrant application was based in part on tainted information (e.g. the presence of drugs in the upstairs portion of the home and McGrane's admission).

The Supreme Court in *Murray* created a test to determine whether a search pursuant to a warrant was in fact a genuinely independent source of illegally obtained information and tangible evidence. It held a subsequent search warrant is not an independent source "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray*, 487 U.S. at 542, 108 S. Ct. at 2536, 101 L. Ed. 2d at 483–84.

To determine whether the information based on the deputies' illegal search affected the magistrate's decision to issue the search warrant, we excise the illegally obtained information from the warrant application and determine whether the remaining legally obtained information supports probable cause. *United States v. Madrid*, 152 F.3d 1034, 1039–40 (8th Cir. 1998); *accord Seager*, 571 N.W.2d at 212 n.5. Without the illegally obtained information, Investigator Wernet's affidavit alleged the following: "Deputy Hepperly received information from a concerned citizen around the first part of July that McGrane was selling drugs and trading drugs for stolen property." Deputy Hepperly was watching the house on July 13, the day before McGrane's arrest, and saw "short term traffic to the residence." One of these persons was Tom Evans, whom Deputy Hepperly knew to be a drug user. When questioned, Evans's companion told Deputy Hepperly they had gone to the house to buy drugs. On July 14, Deputy Klunder was

serveilling McGrane's house in order to catch him at home and arrest him on an outstanding warrant. Deputy Klunder learned through Alberto that McGrane was at the house. Deputy Klunder asked Deputies Hepperly and Ewalt to go to the house and arrest McGrane. While inside, Deputy Hepperly saw McGrane put something behind the bed sheet curtain as he emerged from an upstairs area of the home. McGrane's criminal history included a 1995 conviction for delivery of drugs and a 2004 conviction for possession.

"The standard for probable cause is whether a person of reasonable prudence would believe a crime has been committed or that evidence of a crime might be located in the particular area to be searched." *Naujoks*, 637 N.W.2d at 108 (citing *State v. Poulin,* 620 N.W.2d 287, 290 (Iowa 2000)). With the exception of McGrane's criminal history, all of the information in the application was very recent and strongly suggested drug-dealing activity. McGrane's furtive gesture behind the bed sheet curtain at the top of the steps indicated he was attempting to hide something from the deputies. We find the above information is sufficient for probable cause.

Under *Murray*, we must also determine whether the deputies' "decision to seek the warrant was prompted by what they had seen during the initial entry." *Murray*, 487 U.S. at 542, 108 S. Ct. at 2536, 101 L. Ed. 2d at 483. In its ruling, the district court found the State presented no evidence the deputies would have applied for the search warrant had they not searched the upstairs portion of McGrane's home. We scoured the record and found no such evidence either. We agree with the district court that the State failed to prove the search warrant was an independent source.[4] Consequently, the district court correctly suppressed all evidence seized in McGrane's home as well as his statements to the police.

_____

[4]The State argues suppressing the evidence would place it in a "worse position" than

## IV. Conclusion

We conclude the district court properly suppressed the evidence seized and McGrane's statements to the police. The deputies' initial search of the upstairs portion of the home without a search warrant violated McGrane's Fourth Amendment rights. The search was neither a search incident to arrest nor a protective sweep. Moreover, the evidence was not in plain view because the deputies were not rightfully in the place that allowed them to see the evidence. Finally, the State failed to prove the later obtained search warrant was in fact a genuinely independent source of the evidence at issue here. The State presented no information indicating the deputies would have sought a search warrant had they not illegally searched the upstairs area.

**AFFIRMED.**

---

if it had not engaged in the prior unlawful search in contravention to the independent source doctrine. However, if the State cannot prove the deputies would have applied for a warrant, then they are not prejudiced by suppressing the evidence found and the incriminating statements made by McGrane.